UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DONALD DAVIS, <br><br> Plaintiff, <br><br> v. <br><br> KATHY GRIFFIN, et al., <br><br> Defendants. | CAUSE NO.: 3:17-CV-652-RLM-MGG |

## OPINION AND ORDER

Donald Davis, a prisoner without a lawyer, proceeds on an Eighth Amendment claim against Counselor Schulz and Officer Kennell for failing to protect him against an attack by his cellmate on June 5, 2017, and on an Eighth Amendment claim against Dr. Marandet and Nurse Practitioner Myers for providing inadequate care for the injuries he suffered as a result of the attack. The defendants filed these motions for summary judgment, arguing that Mr. Davis hasn't demonstrated that Counselor Schulz and Officer Kennell knew that the cellmate presented a substantial risk to his safety and that Dr. Marandet and Nurse Practitioner Myers provided adequate medical care to Mr. Davis.

## FACTS

Mr. Davis was assigned to a cell with Randall Izquierdo in December 2, 2018. Mr. Davis and Mr. Izquierdo didn't get along; they disagreed often about bed assignments, use of the television, and visitors. Mr. Izquierdo also tried to intimidate Mr. Davis by staring at Mr. Davis as he slept, complaining about Mr.

Davis's race, and becoming upset if he heard Mr. Davis urinate in the cell toilet. On December 7, Mr. Davis wrote to Counselor Schulz, stating, "I am having problems with my roommate. Things are not working out with us. I now request to be moved into some other cell." Counselor Schulz told Mr. Davis the next day that he couldn't be moved for ninety days and that Mr. Davis had to find a new cellmate on his own. Mr. Davis last spoke with Counselor Schulz about his cellmate in January 2017.

On the morning of June 5, 2017, when the cellhouse was on lockdown, Mr. Izquierdo stuffed newspaper into the toilet and flooded the cell. For hours, he paced the cell and yelled through the door and on the intercom. When Mr. Davis heard staff outside the cell, he yelled through the door for the unit team to come to the room because there was a problem. He yelled that his cellmate was acting out and that he needed to be moved.

At his deposition, Mr. Davis testified about the assault as follows:

**Defense Counsel:** Can you tell me generally how long the altercation lasted?

**Mr. Davis:** I don't know. Like I say, I was writing a letter. After he flooded the room our, he was standing at the front of the door. He mumbled something. I seen him taking his genitals out. I raised up because I was sitting up in the bed with my legs propped, and I was writing a letter. When he took his genitals out, I raised up. And I had just turned on the hotpot then. I said, well, I'm up. I'm going to make some coffee.

So I turned it on. I mixed everything for the coffee. I could see him from my peripheral view standing at the door. He started coming my way, urinating on the floor. But then he didn't get to me, so I moved to the back. And then I put my feet over the side and I raised up. So then he jumped up on the bunk. He jumped back down. He hit the buzzer. I heard the man say, "What?" He started cussing the officer out. And then he's doing all this, and I'm still writing.

So I heard him say, you MF, mother fuckers are pissing me off. And then I seen him reach and grab the hotpot. I knew then I was in trouble. That's when I knew I was in trouble, when he grabbed it.

Officer Kennell arrived with another officer and ordered the inmates to separate. Mr. Davis was escorted to the restricted housing unit and was redirected to the infirmary.

Mr. Davis also testified about the threat posed by Mr. Izquierdo before the attack:

> **Defense Counsel:** Can you tell me when the first time he threatened physical violence?
>
> **Mr. Davis:** That was on the 5th of June when this happened.
>
> **Defense Counsel:** Did he say anything to you in terms of threatening physical violence?
>
> **Mr. Davis:** No, he didn't.
>
> * * *
>
> **Defense Counsel:** Did you ever request to be placed in protective custody?
>
> **Mr. Davis:** No.
>
> **Defense Counsel:** Why not?
>
> **Mr. Davis:** What for? What would I be put in protective custody for? I'm working in the infirmary. I had no reason to go to protective custody. This man hadn't threatened me. Like I told -- when I finally got a change to talk to what they call a DII here, who came and seen me like almost 40-some days after the assault, like I told them, he -- this was an unprovoked attack. He didn't give me no reason to think -- out of all the stuff he was doing, even when he took his genitals out and started walking back and forth in the room and urinating in the room.
>
> * * *

3

> But my point is, I had no reason to ask for protective custody, because all the stuff that he was doing, he didn't give me no reason to think that he was fittin' to attack me. And when did attack me, I was to the side, and I was writing a letter when I got attacked. So . . .

According to the medical records, about an hour after the assault, Dr. Marandet assessed second degree burns on the right shoulder and neck. He admitted Mr. Davis to the infirmary, prescribed Ultram for pain, and ordered the daily application of burn creme and dressing. Two weeks after the attack, Dr. Marandet observed that the burns had healed. He also noted drainage from Mr. Davis' right ear and ordered ear drops. Mr. Davis was discharged from the infirmary the next day and was assigned to the disciplinary housing unit. Two days later, Dr. Marandet prescribed Ultram at a tapered dosage for seven days, reasoning that Ultram was an addictive controlled substance and that Mr. Davis could switch to another pain medication.

Nurse Practitioner Myers assumed care over Mr. Davis on June 27. She observed that he was healing well but had some areas that still required dressing. She ordered Tylenol for pain and Aquaphor to reduce itching, and she continued his orders for Aquaphor, burn creme, and ear drops. On June 29, Nurse Practitioner Myers responded to Mr. Davis's reported ear pain two days later by ordering antibiotics and scheduling a follow up appointment. On July 11, she observed healing wounds and ordered dressing changes for the next ten days and another round of antibiotics for the ear. Two weeks later, Mr. Davis complained of continued pain and refused Tylenol because he once had an ulcer, and Nurse Practitioner Myers prescribed prednisone.

4

On September 26, 2017, Mr. Davis reported that he had injured his left hand when his cellmate attacked him and complained of pain. Dr. Marandet ordered X-rays and Ultram for pain relief. The X-rays revealed mild degenerative changes, mild osteoarthritis, mild misalignment of the thumb, but no fractures. Dr. Marandet replaced Ultram with Mobic the following week due to Mr. Davis's complaints of nausea and vomiting. Dr. Marandet discussed the X-ray results with Mr. Davis two weeks later. Based on these results, Dr. Marandet sent Mr. Davis to physical therapy instead of an outside specialist. In the following months, Mr. Davis met with a physical therapist on several occasions, and he received a home exercise plan and a brace for his thumb. On May 10, 2018, Mr. Davis was discharged from physical therapy for lack of improvement. Though he continued to complain of pain, he was able to perform daily functions and work at his job in the kitchen and continued to receive Tylenol.

At his deposition, Mr. Davis testified that he complained in June 2017 to Dr. Marandet about his left hand but Dr. Marandet refused to treat examine it or treat it. He testified that during his time in the disciplinary unit, he told Nurse Practitioner Myers each time he saw her that he hadn't received ear drops, pain medication, or regular wound care despite the standing orders and that he needed X-rays for his left hand. She explained to him that she would look into it, but his treatment from medical staff never improved. He further testified that his burns didn't heal while he was under Nurse Practitioner Myers's care. Id. at 54. At the time of his February 2019 deposition, Mr. Davis reported continued

hand pain and that he couldn't play pool or lift weights, though his ability to grasp objects had improved.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Ogden v. Atterholt, 606 F.3d 355, 358 (7th Cir. 2010).

Mr. Davis alleges that Counselor Schulz and Officer Kennell acted with deliberate indifference by failing to protect him from an attack by his cellmate. The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." Id. at 833. "[t]o state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety. Santiago v. Walls, 599 F.3d 749, 756 (7th Cir. 2010). In the context of failure to

protect cases, the Seventh Circuit has equated "substantial risk" to "risks so great that they are almost certain to materialize if nothing is done." Brown v. Budz, 398 F.3d 904, 911 (7th Cir. 2005). In such cases, "a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996).

Mr. Davis argues that Counselor Schulz should have reassigned him from the cell before the attack and that Counselor Schulz and Officer Kennell should have responded to his calls for assistance on the day of the attack. The record indicates that Mr. Davis and Mr. Izquierdo did not get along and that Mr. Izquierdo's behavior was unusual, but it doesn't support a reasonable inference that he posed a substantial risk of serious harm to Mr. Davis's safety during the six months before the attack. As Mr. Davis testified, Mr. Izquierdo had never threatened Mr. Davis with violence or given Mr. Davis any reason to suspect that he would attack him before Mr. Izquierdo grabbed the hotpot. Without any apparent safety concerns over the course of six months, Counselor Schulz couldn't have been aware of a substantial risk of harm to Mr. Davis's safety when he declined to change Mr. Davis's cell assignment. Similarly, even if Counselor Schulz and Officer Kennell heard Mr. Davis's requests for assistance on the day of the attack, these requests didn't convey that Mr. Izquierdo posed a substantial risk of harm to Mr. Davis. Though Mr. Davis argues that these defendants knew of Mr. Izquierdo's history of mental illness and attacking cellmates, the record contains no evidence that Mr. Izquierdo had such a history or that the

7

defendants were aware of it. Counselor Schulz and Officer Kennell are entitled to summary judgment.

Mr. Davis alleges that Dr. Marandet and Nurse Practitioner Myers acted with deliberate indifference to his medical needs by providing inadequate treatment for his burns, ear infection, and left hand. To prevail on this claim, Williams must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005).

Mr. Davis argues that Dr. Marandet acted with deliberate indifference by offering no medical treatment for the hand injury in June 2017. While Dr. Marandet denies that Mr. Davis complained about his hand injury at that time, Mr. Davis testifies that he reported the injury to Dr. Marandet on June 5, 2017, and June 19, 2017. The defendants suggest that Dr. Marandet decided to focus on treating the burns as the more immediate concern instead of the hand injury. A doctor might make such a decision in accordance with his medical judgment,

the record doesn't support that possibility. There is no indication in the medical records that Dr. Marandet gave the hand injury any consideration, and Dr. Marandet simply attests that he did not recall any complaints about the hand injury. Mr. Davis's testimony, if believed, would allow a reasonable jury to conclude that Dr. Marandet acted with deliberate indifference by ignoring the report of the hand injury in June 2017.

Next, Mr. Davis argues that Dr. Marandet acted with deliberate indifference by not seeing him again until September 26, 2017, despite his written requests for treatment for the hand injury. On June 27, 2017, Nurse Practitioner Myers assumed the role as Mr. Davis's primary treatment provider, and it was reasonable for Dr. Marandet rely on Nurse Practitioner Myers to provide adequate treatment to Mr. Davis at this time. It appears that Dr. Marandet resumed his role as the primary treatment provider after Mr. Davis moved out of the disciplinary unit, but the record contains no evidence that Dr. Marandet was aware of this move or the written requests for medical treatment. Mr. Davis further argues that Dr. Marandet should not have prescribed him Ultram for pain in September 2017 because it caused nausea and dizziness. While Dr. Marandet may have been aware of the potential side effects, there was no indication that he should have known that this prescription was medically inappropriate. When Dr. Marandet prescribed the same medication for the same purpose in June 2017, Mr. Davis did not report any side effects. Additionally, Dr. Marandet responded reasonably to Mr. Davis' complaints about Ultram by switching him to Mobic.

Mr. Davis argues that Nurse Practitioner Myers acted with deliberate indifference due to her inadequate efforts to ensure that medical staff followed her orders despite Mr. Davis advising her that her orders weren't followed and her assurances that she would address it. Though the medical records indicate that the orders to provide medication and daily wound care were being followed and that the burns were healing well, Mr. Davis denied this at his deposition, so whether the medical orders were followed is a disputed fact. Moreover, while Nurse Practitioner Myers can't be held liable under Section 1983 for the conduct of other staff members or for not performing the duties of other staff members, she had a duty to respond reasonably to Mr. Davis's concerns, and the record contains no evidence that she took any action after verbally assuring Mr. Davis that she would do so. See Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."); Id. at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."); Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("Indeed, prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent."). A reasonable jury could conclude that Nurse Practitioner Myers acted with deliberate indifference due to inadequate efforts to ensure that medical staff followed her orders.

Based on this reasoning, the motion for summary judgment is denied with respect to Dr. Marandet and Nurse Practitioner Myers. Mr. Davis may proceed on his claim against Dr. Marandet for offering no treatment for the hand injury in June 2017 and on his claim against Nurse Practitioner Myers for inadequate efforts to ensure that medical staff followed her orders.

For these reasons, the court:

(1) DENIES the motion for summary judgment filed by Dr. Marandet and Nurse Practitioner Myers (ECF 106);

(2) GRANTS the motion for summary judgment filed by Counselor Schulz and Officer Kennell (ECF 109); and

(3) DISMISSES Counselor Schulz and Officer Kennell.

SO ORDERED on August 26, 2019

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT